Thank you, Your Honor. My name is Richard Martinez, and it's my privilege to be here before you on behalf of Becky Becceril. May it please the Court. Nearly 20 years ago, the American people were provided a promise by our Congress and President. That promise was that for the tens of millions of Americans who find themselves suffering from a disability, that they would have a meaningful You're not arguing to a jury. Okay. Okay, Judge Fletcher. With respect to the issues in this appeal, under the Americans with Disabilities Act, and certainly there's a question of retroactivity that I will address, the question becomes that are before the Court are three. Is TMJ, at least in the particularized inquiry that is required from Ms. Becceril, that which is a major life function, and one in which that major life function are so affected that she is substantially different from the average person? We believe the answer to that question is yes. Second, is there sufficient evidence here in the de novo review with respect to the question of her transfer from the mobile home section to the customer service desk that that should go to the jury with respect to was that a decision based on her disability? And finally, Your Honor, is the question of retroactivity. If I could take those in order with your permission. We believe that this case comes before you in the same posture as Roar, Roar v. Salt River Project, in that you had a, while Roar and Frazier addressed the issue of diabetes, and there are very little case law specific or appellate decisions on the issue of TMJ, that you essentially have someone who has a permanent condition that is undeniably incurable, and in the record in this case, Your Honors, you had, while not required, substantial medical evidence of the condition. And let me ask you some questions about that. Is it your argument that this condition always counts as a disability for ADA purposes, or only that its manifestations for this individual count as a disability? Judge Garber, I would go to the latter. I think what the case law provides, and certainly in our district, excuse me, in our circuit provides, is that you still are required to make that particularized inquiry. So you have to look at the individual. Okay. What are the major life activities that your client cannot do in daily life that are substantially impaired versus the normal person? I didn't state that very well, but what are the major life activities that you want us to focus on? I think there are at a minimum two, Your Honor, and certainly talking is one, or speaking. And as the Amendments Act, the new Amendments Act refers to it as communicating. Certainly as you look at communicating. Secondly, it is as to eating. And certainly there are a number of effects that she has from the condition as a result of what she suffers. For example, she has frequent headaches. She reports that she was having at least three to four a week. Now you're getting off into symptoms. I want to know first your list of major life activities that you contend that she can't do significantly differently than others. I think the two principal ones, Your Honor, are with respect to speaking or communicating, and secondly, eating are the two major life functions. I think that there are others that occur as a result of the consequences of the pain disorder that's a result of overuse. And so what major life activities additionally would that implicate? The major life activities of the additional ones? Yeah, you said that as a result of it, she has pain, which also affects other activities, what are those? Yes, and what the record demonstrated is that she had trouble, for example, thinking. She had trouble sleeping. She found herself unable to concentrate. And that depending on the severity of the pain, and then she even got to the point of also in the same way referencing that depending on the dosages of the medications that she took were numerous, would have those similar kinds of effects with respect to thinking and concentrating or her ability to be at work. The district court... I'm sorry to keep asking questions, but I'm really struggling with this. As I understand it, she has difficulty thinking and concentrating and sleeping only when she's under stress. In other words, if life goes on calmly and she doesn't have a lot of work requirements and so on, the speaking and eating are affected, but not necessarily headaches, pain, difficulty concentrating. Judge, may I address that just for a moment? Yeah, is that... The TMJ judge, I think, to the latter points, certainly when overuse of the jaw occurs and she has an aggravation, those are very true. The frequency of headaches increases, and the severity of the pain associated with those headaches has that effect, and then the use of the medications has it. But also in her particular condition, as the record reflected, that you can, with this particular condition, you have good days and bad days, so even such things as a change in temperature can cause a flare-up, as it was referred to in the record. So those are less frequent. But I understood this record to be such that unless there was stress, these effects were infrequent. They were certainly not as frequent, Judge, and I think that what the record reflected is, if I can put it in two... We have three timeframes in this record. We have that 10-year period when she's in mobile homes, which is the 93 to 2003 period, which is up to December of 2003, September of 1993 to December of 2003, so that's that 10-year period. Then we have the approximate two-year period in which she's at the customer service desk, where she's asked essentially to talk in a speaking position eight hours a day. And then we have at the end of the period, by the time of her deposition, where she has requested to fill in, to transfer into a vacancy, where she's in an audit section, where she has very little contact with the public. She describes two to three phone calls a day and doing primarily historic property work in the assessor's office. So if you look at the frequency within those, in that last assignment, she had the least aggravation in the workplace with respect to her TMJs. In the mobile home section, she had accommodation informally, was provided as needed, and the record reflects that when she needed time off, that was provided. That's the morale issue that's referred to, and that's why Rick Lyon says he moves there, because of the disgruntled things that come to his attention with respect to, you know, how frequently she's at work, although there's no discipline of that at any time. And then we have the question of when she does get moved involuntarily to the customer service desk, certainly on the TMJ, even though Mr. Lyons denies initially knowing of her condition, he admits openly that within a four- to six-week period of her initial assignment there, he was aware of her TMJ condition. He was aware of the record that was established when she requested FMLA certification by her physician's certification, in which the TMJ is clearly identified. And they acknowledge her frequent use of that FMLA certification or that leave that was provided by federal law, because of the flare-ups of her condition at that front desk. In addition, not only was she being utilized at the front desk as any other person would have been, she was utilized in an extra ways, two extra ways. One was as Miss Besserell's Hispanic and a Spanish speaker. So to the extent that you have Spanish speakers coming to the front desk, and they do, we're a population in Tucson, Arizona, where we have a third of our population is Hispanic, and among those are many Spanish speakers. She's the one and only person at that front desk who's a property appraiser, has that specialized background, who can answer questions for the Spanish-speaking public. In addition, she's the only one there who has a specialized background with respect to mobile homes. So what it did was that it really put her to the forefront of being utilized in that customer service position, which is the very worst thing you could do for her in her condition. Let me, I'm still noodling with this, how you decide whether someone is disabled within the meaning of the statute, when thinking and  concentrating on our issue. And what's, I guess what I'm struggling with is that many people have difficulty thinking and concentrating when they are in stressful situations, including, but not limited to, stressful public contact work situations. And so I'm having difficulty with how we decide whether that her, you know, is disabled or not. The inability to think and concentrate when faced with a stressful situation is materially different than that of an average person who's faced with a stressful situation. Well, Your Honor, let me say two things about that. I think that when you get to the question of thinking and concentrating, that is the result of the aggravation. So she's now moved from her state of being within pain control to her pain's out of control. So we're not saying that her thinking and her concentrating is always effective. I know that, but that's actually sort of part of what's bothering me about it, because in those, I guess what I'm struggling with is, isn't it true that most people have periods of time, whether caused by pain or otherwise, when it is difficult to think, difficult to concentrate, when they are in under stress or in stressful settings? Certainly not to the degree and severity of Ms. Besserell, Your Honor. And I think those people who suffer from TMJ to the degree that she has, the degree of degenerative, because it's severe degenerative arthritis in her TMJs, when you're to that level of this particular ailment, of this disease, and you then are aggravated, you're trying to concentrate, you're trying to concentrate on something, you know, overuse of the jaw occurs, then you find her having the onset of these, which he describes as level 10 pain headaches, and essentially it causes her to shut down. And so in that particular circumstance, I think that she is not like the average person, and she's substantially different. I do want to reserve about two and a half minutes, Your Honor. But let me say that even if you've never been in pain control, never reached the thinking or include the thinking, certainly the communicating, the speaking is a major life activity, and it was substantially different for her and her overuse of her jaw. And additionally, the eating is, again, not a choice for her. This is something where she can't eat, but you and I and the rest of us or those who do not have this condition can eat. We eat whatever we choose. We chew whatever we choose. We use our jaws freely, not with these limitations. And that's what puts her exactly in that category of individuals that was intended to be protected. Even under Sutton, she's protected, just as in Roar. And certainly we believe that with respect to the 2008 Amendments Act to the Americans with Disabilities Act, that she's, with respect to Ms. Besserell, this doesn't in any way expand her rights. All it does, I think, is add further clarification that she's certainly an individual with a disability that was always intended to be covered by this Act. Thank you. Ms. Roseberry. May it please the Court. Your Honors, there are a number of items addressed in the brief that we believe merit your attention. But I think I would like to start with the retroactivity issue, unless you have questions in addition to the ones you've been asking, Mr. Martinez, regarding the disability issue. Pima County's position is that the ADA Amendments Act is not retroactive for two reasons. First, the amendments have a specific and delayed effective date. The statute was enacted on September 25, 2009, and it became effective on January 1, 2008, rather, and became effective on January 1, 2009. And the amendments have a specific and delayed effective date. There is nothing in the statute or in the legislative history of the statute indicating that Congress had any intention for those amendments to be applied retroactively. Mr. Martinez has mentioned that his argument is that the ADA amendments merely clarify the original purpose of the ADA. This particular argument was recently addressed by the District of Columbia Circuit Court in the Light's opinion. That was issued back in 2010, and the delayed effective date indicated that clarification was not at all what the intention of Congress was in enacting the ADA amendments. Are you asserting that the result would be different if we applied the new statute? I think the result could be different, and it would be similar to what happened in the Light's opinion. Under the pre-amendment ADA, Pima County's position is that Ms. Besserell is not substantially limited in any major life activity, and therefore the county would not be liable for failing to provide her with a reasonable accommodation, which is the underlying allegation in her lawsuit. Under the amended act, because the act has broadened the scope of people that are included by expanding the scope of the definition, Pima County could potentially be liable for not providing her with that accommodation as the act has been amended. Would you address specifically how we should analyze the major life activity of thinking and concentration? It's a difficult one for me personally to grapple with, because it seems that almost any condition could cause pain, discomfort, distraction, and so forth that would affect thinking, and how do we decide if it's substantially affected or not? Do we compare her under stress with normal people under stress? What do we do analytically to decide? The analysis that the district court engaged in was whether or not Ms. Besserell experienced these pain systems, symptoms, excuse me, often enough for it to be considered a substantial limitation of any of the major life activities, including the thinking and the concentration. And what it shows in this case is that Ms. Besserell's pain symptoms varied. Her own testimony was that she experienced the pain systems depending on a variety of factors, stress being one of them, weather conditions was another one, how often she was having to deal with taxpayers, which caused her quite a bit of stress, apparently. And what the court concluded below was that these symptoms did not occur often enough for her to have any kind of limitation in those major life activities. I'm not sure that helps me solve my own problem, and maybe I just have to approach it a different way. But I suppose one way to analyze any of these issues is to say no matter how bad the thing is, does it happen often or not very often, and that's one way to look at it. But let's assume temporarily we were to disagree with you. Let's assume that it looked like her concentration and thinking was affected more than minimally. But in terms of length of time, what do we do with it substantively? How do we know whether it's substantial when you get to something as abstract as that? I mean, seeing, hearing, those things are kind of easy to measure and figure out. This seems amorphous to me. Your Honor, I would absolutely have to agree with that. It's been a little amorphous for me as well. Typically in this analysis, the factors that are looked at are the nature and severity and the duration and the impact of an impairment on a major life activity. All of those things in combination have to be looked at. And it's important to note that there was no evidence on the individual's own personal experience with the limitations and their impairment. In this particular case, what the record shows is to the degree that Ms. Besserell was having any limitations, they were — it depended on a variety of factors. The other thing that the county believes is important is that this seemed to be predominantly a work-related issue that was important in the district court's decision, that there was almost no evidence about how she was limited in any major life activity, including thinking and concentrating outside of work. The vast majority of the evidence that she's provided, which is actually fairly limited about her limitations, was with regard to working, and working very specifically at the front counter in the assessor's office. That's where she claimed to be having the increased stress levels, which to some degree, which is unclear in the record, increased the amount of headaches and other pain symptoms that she was experiencing, which would then allegedly limit her in the major life activities. Counselor, do you think that this is suitable for summary judgment, or is this something the jury should be looking at? Pima County believes this is suitable for summary judgment. There's so many variables here, and is it over the line to possibly be a kind of disability that would come under the Act, or is it not? I mean, we're just kind of in this never, never land. We believe it's not. The evidence in this case is what it is in the record. Discovery has closed. Ms. Besserell had a number of opportunities to provide further clarification. What the evidence, in fact, shows is that she had a variety of pain symptoms, predominantly headaches, jaw pain, neck pain, I believe are the three that she said occurred consistently together. They occurred from three to five times a week. It wasn't always a weekly occurrence for her. Sometimes her pain was at a three on a one to ten scale. At other times it was a ten on a one to ten scale. But she provided no information about how frequently she had pain levels that were a ten, or however frequently it was at a three. She also didn't provide any evidence about how long a headache would last, or these pain symptoms would last when her pain level was at a ten on a scale of one to ten. These are the factors that the district court all examined, and we believe properly found that there was not enough evidence to show that she was substantially limited in any major life activity by her impairment. Is it clear that work-related problems don't qualify? I believe that the answer to that is no, that a work-related problem is not enough. That the limitation in a major life activity has to occur in daily life. So talking is not something that would exclusively occur at work. Thinking and concentrating is not something that would exclusively occur at work. Those are activities, obviously talking, that people engage in throughout the day in their daily activities. The only indication that Ms. Besserill has given is that this was a work-related problem, and even more specifically, that it was a work-related problem when she was assigned to the front counter for roughly a two-year period of time. What's her situation right now? Is she still working for the company? Yes, she still works for Pima County. She is still at the assessor's office, and I believe she's still in the audit section. The other interesting factor here is that her own testimony, and it was agreed upon by, I think, almost everyone who was deposed, who was in some supervisory capacity, was that Ms. Besserill has always performed satisfactorily in her job and often exceeded expectations. That was something that also occurred when she worked at the front counter. Pima County has pointed out in its brief that a lot of the evidence that was provided is evidence that she was able to talk and that she was able to function. So it doesn't — that information, in addition, indicates that there was not a substantial limitation to the degree that there was a limitation that occurred under very limited circumstances and at a time which Ms. Besserill has not been able to sufficiently identify. Do you agree that there was no interactive consultation that would qualify under the statute? I think my best way of answering that is that those facts would be disputed in Pima County's opinion. They weren't argued on summary judgment because Pima County believes that there are significant disputed facts regarding how she made her request, what the response was to the request, and the following, the position in the motion for summary judgment, was that that actually falls out because she can't make her prima facie case and show that she's a person with a disability. Everything else then becomes irrelevant. I think I'll touch briefly on the pretext issue. There were a couple of comments that were made regarding the reasons why she was moved. There's more than one reason why she was moved. The assessor at the time, Rick Lyons, moved Ms. Besserill for three reasons, and none of them are actually her attendance. What was the actual third reason was what Mr. Lyons concluded was a morale problem that existed in the mobile home section. That was based on at least a perception by the coworkers of Ms. Besserill that their manager, Tomas Estrada, was clocking Ms. Besserill out and therefore she was being paid for work that she wasn't doing and she wasn't having to use her leave like the other employees were having to do when they were absent from the office. In his deposition, Mr. Lyons indicated that he was concerned that there might be potential criminal conduct going on, which is an indication that he was concerned not about her attendance, but about some other underlying activity that was going on. Those particular comments are found in ER 14, page 19, lines 23 through 25, and page 46, lines 7 through 11. Unless the panel has any further questions, Pima County would like to rely on its brief. Sotomayor, I don't believe that we do. Thank you. Mr. Martinez, you have a lot of time. If I could address first the part that has been troubling you with respect to thinking and that, and I would point to you at tab 21 in the excerpts. There, there's some very clear things said in Dr. Harkin's report. He says that these conditions are permanent and incurable, and he says these painful symptoms are aggravated by use of the jaws. In the parenthetical it says talking and chewing, and then he goes on to say, and emotional stress and anxiety, which are an aggravator of this particular condition. In addition, with respect to the question of what is there in the record to support Ms. Besserow's condition as to the frequency with which that occurred, she also in the questionnaire completed, indicated for Dr. Harkin's, that she was suffering from these conditions on a weekly basis. The headaches were from three to four times a week. And again, those are at tab 25, Your Honor. And she goes on to agree, you know, severe headaches three to four times a week, and et cetera. I would like to say something about that, though, because I think there's a misconception here. I think there's this notion. One second, would you run the clock? You've got the advantage. I saw the 134, Judge. I did. Not my intent to go. But, you know, in Rohr and in Frazier, especially in Rohr, we talk about someone with diabetes, and we don't talk about them when they're at their worst. If you recall in Rohr, there are two key things that come up. Mr. Rohr could not be available for the hands-on. He could not be working more than nine hours a day. And then there was a limitation on travel. And I'm not, I don't think in this case there's a question about the essential functions of the job as there was in Rohr. But the whole point is if a person suffers from diabetes, they have it 24 hours a day. If you have TMJ, you have it 24 hours a day. And when you have diabetes and you have to watch your diet, you have to watch it 24 hours a day. But when you have TMJ and you restrict it in how you use your job, that is 24 hours a day. There's nothing, absolutely nothing in this record, Your Honors, that Ms. Besserell used her job in a limited way at work, but did something different out of work hours. That doesn't exist in this record. And I certainly wouldn't want you to draw that or the suggestion that was made by Consul that such exist, because it doesn't. You know, when she was incapacitated by the degree of pain when she suffered, she's out of it in all aspects of her life. In addition, if I could for a moment to address the issue of the pretext issue. It is our contention that this record satisfied the summary judgment standard, and that what happened here is that all of those inferences that should go in her favor were ignored, and that those, these were all contested issues of fact that were best left to the jury. We would ask for reversal and remand that is consistent with those standards. Thank you. Thank you, Counsel. We appreciate your arguments, and the case is now submitted, and we will stand adjourned.
judges: Fletcher B. , Canby, Graber